**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 17-CR-215 |
| v. | The Honorable Leonie M. Brinkema |
| RAYMOND JUIWEN HO, | Sentencing Date: February 2, 2018 |
| *Defendant.* | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

Defendant Raymond Juiwen Ho seemingly had it all.  After emigrating from Taiwan at a young age, he excelled in U.S. schools, earned two legal degrees, practiced law at some of the largest law firms in the country, and even opened his own patent law firm.  The Defendant, however, was not the upstart attorney his résumé would suggest.  Rather, from at least March 2013 to February 2017, the Defendant engaged in a large-scale money laundering scheme, moving millions of dollars through bank accounts (some of which were attorney trust accounts) controlled by him or the individuals he recruited into his scheme.

Particularly striking is the gall of the Defendant's conduct.  As the Defendant explained to an undercover law enforcement agent in a recorded conversation in February 2016, "I'm a different type of attorney."  Indeed, he was.  The Defendant was an attorney willing to ignore his ethical and legal obligations if it meant more money in his pocket.  The Defendant was an attorney who repeatedly laundered money he knew constituted criminal proceeds, and did so even in the face of bank account closures and law enforcement inquiries.  The Defendant was an attorney who had no qualms, so long as the cash was real and he got his cut.

Accordingly, in light of the breadth and brazenness of the Defendant's conduct, the government is seeking a significant sentence. As explained below, the government submits that a meaningful sentence is necessary not only to deter the Defendant from engaging in criminal conduct again, but also to send a clear message to the community that such behavior will not be tolerated, particularly by those who have taken an oath to justly and uprightly conduct themselves as members of the legal profession. The Defendant is expected to argue, consistent with the U.S. Probation Office's position, that his properly calculated guidelines range is **188 to 235 months**. The government, however, submits that the Defendant's guidelines range is **262 to 327 months**. Regardless of how the Court computes the Defendant's guidelines range, the government respectfully recommends a sentence at the low-end of the Defendant's properly calculated guidelines range.

## BACKGROUND

On September 21, 2017, the government filed a two-count criminal information that charged the Defendant with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and money laundering, in violation of 18 U.S.C. § 1956(a)(3). (*See* Criminal Information, Dkt. 1.) Then, on October 19, 2017, the Defendant waived his right to indictment and entered a guilty plea to both counts charged pursuant to a plea agreement. (*See* Minute Entry Order, Dkt. 7; Plea Agreement, Dkt. 8.) The Defendant also stipulated to the conduct described in the Statement of Facts filed in this matter. (*See* Statement of Facts ("SOF"), Dkt. 8.)

## I.     The Conspiracy to Launder Money

As the Defendant has admitted, from at least March 2013 through at least February 2017, he participated in a conspiracy to steal and launder money from unwitting victims. (SOF at ¶¶ 4–6.) The conspiracy operated as follows:  conspirators created email accounts that imitated the

email accounts of real individuals and entities, and then used these fake accounts to send "spoofed" emails that convinced particular individuals and entities to transfer money into accounts controlled by the conspirators, including the Defendant. (*Id.*) Once the money was transferred into an account controlled by the Defendant, it was his job to launder those unlawful proceeds for his co-conspirators. He did so by moving the funds through and to accounts located in the United States and abroad. (*Id.*)

Over time, the Defendant became a prolific money launderer. As set forth in the Statement of Facts, he laundered money that had been stolen from multiple victims. The Defendant and his co-conspirators ultimately laundered $2,143,339 in connection with these victims, and intended to launder even more: $2,918,658.97. (*Id.* ¶ 39.)

Although the Defendant's money laundering activities were done primarily at the direction of a particular co-conspirator, he was not an unthinking subordinate. Indeed, the Defendant's participation in the conspiracy was marked by attempts to minimize outside scrutiny and reduce his exposure. For instance, in July 2014, a certified public accountant was duped into transferring money belonging to an individual referred to as "M.L." That money was transferred to a Bank of America account controlled by the Defendant. But, this account was not a regular account; instead, it was an Interest on Lawyers Trust Account ("IOLTA"), an account that lawyers are supposed to use when third parties have entrusted funds to them. (*Id.* ¶¶ 10–12.)

The Defendant also recruited others to assist in the movement of money, thereby further obfuscating the nature of the transactions. In fact, as set forth in the Statement of Facts, money belonging to four victims initially was transferred into accounts controlled by individuals the Defendant had convinced to join the conspiracy. Thereafter, those funds were routed, at the

Defendant's direction, either to other co-conspirators or to himself.  (*Id.* ¶¶ 24–27, 31–33, 35–37.)

Another way the Defendant tried to conceal his money laundering scheme was by falsely describing the nature of the transaction on bank forms or by creating fake contractual agreements.  For example, after $287,491 of M.L.'s money was transferred into the Defendant's IOLTA at Bank of America, he sent a wire in the amount of $140,000 to a particular account at the Community Bank of Louisiana.  To effectuate this transfer, the Defendant completed a "Funds Transfer Request Authorization" ("FTRA") form.  On this form, the Defendant indicated that the purpose of the transfer was:  "RETURN OF FUNDS."  The Defendant subsequently emailed a copy of the FTRA form to the individual who had directed the Defendant to launder the money.  (*See* Ex. A (Redacted Email Dated July 16, 2014), RH-00012998, RH-00013002.)  Similarly, the Defendant called himself a "paymaster" and, on occasion, created what he called "paymaster agreements."  (*E.g.*, Pre-Sentence Investigation Report ("PSR") at ¶ 7; SOF at ¶ 21.)  The Defendant, however, never was licensed to provide money transmittal services, (SOF at ¶ 52) and the agreements were shams intended to provide an air of legitimacy to the Defendant's criminal scheme.  (*Id.* ¶ 21.)

Markedly, the Defendant repeatedly laundered money despite warnings that his conduct was drawing scrutiny.  For example, in July 2014, the Defendant sent an email to a co-conspirator that listed account information for seven of the Defendant's bank accounts and noted that the Defendant "plan[ned] to open more accounts due to account closures at Bank of America, Citibank, and Wells Fargo."  (*Id.* ¶ 16.)  Then, in December 2014 and January 2015, the Federal Bureau of Investigation questioned the Defendant about his money laundering activities.  The Defendant responded by lying to the FBI, claiming that:  he was the victim of

fraud; that he did not have email exchanges with a particular co-conspirator; and that the transactions under scrutiny were pursuant to a supposed "paymaster agreement." (*Id.* ¶¶ 23, 30.)

## II.    The Sting Operation

The full extent of the Defendant's brazenness and above-the-law attitude was revealed during a sting operation that agents of Homeland Security Investigations launched in November 2015. Only a month after receiving an email from an undercover agent ("UCA") about moving money "out of the country urgent[ly]" and in a "confidential" manner, (*id.* ¶ 40) the Defendant laundered $12,000 for an UCA who had represented the funds had been derived from smuggling illegal aliens into the United States. (*Id.* ¶ 41.)

This initial interaction with the UCA, which occurred on December 17, 2015, was notable not only because of the speed by which the Defendant agreed to launder money, but also because it provided insight into actions taken by the Defendant in the conspiracy described above. Recall, for instance, the Defendant sending a FTRA form to a co-conspirator and creating paymaster agreements. During the December 17 meeting, which was recorded, the Defendant volunteered to provide the UCA with similar documentation. Specifically, he stated that he would email the UCA a "receipt" and would call the transaction an "investment" or "project." Later in the conversation, the Defendant explained that invoices are "like an insurance" and he generates such documents "just in case if they might ask questions" and he needs to "justify" the transaction. (*See* Ex. B (Excerpted and Redacted Video from Dec. 17, 2015 Undercover Meeting), RH-00004524; Ex. C (Redacted Trans. of Dec. 17, 2015 Undercover Meeting at 3, 7), RH-00001340, RH-00001344.)

Equally insightful from the December 17 undercover meeting was the Defendant's nonchalant reaction to the UCA's statements about the legality of their transaction. When the

UCA expressed concern about going to jail and sought to confirm that the Defendant would not file reports in connection with the handling of the $12,000, the Defendant laughed and repeatedly indicated that he would not file reports on the transaction. (*See* Ex. B; SOF at ¶ 42.) In fact, the Defendant seemed more concerned with the next money drop and whether the money was "real cash":

> **UCA**: And, another thing my boss wanted me to mention is that you knew, that, you know, he wanted to give you an opportunity that if you weren't comfortable with this to move out, so.
>
> **HO**: No, it's fine—
>
> **UCA**: Okay
>
> **HO**: but let's make sure it is real cash

(*See* Ex. B (cross-talk omitted); Ex. C at RH-00001341–42.) Later in the conversation, the Defendant added:

> **HO**: As long as it's, you know, the only thing I worry about is counterfeit.
>
> **UCA**: No, no, it's not counterfeit no.
>
> **HO**: Okay, as long as it's not counterfeit we're fine. Cause that would get me in trouble.
>
> **UCA**: Oh yeah, yes, understand. I don't want—yeah, I see, I see this being a good business partnership so.
>
> **HO**: Okay. Alright. As long as it's real money—
>
> **UCA**: Yup, real money, we're good to go.
>
> **HO**: I can deal with the rest, [inaudible].

(*See id.* at RH-00001342 (cross-talk omitted).)

After the December 17 meeting concluded, the Defendant did not hesitate to move forward with the transaction. The very same day as the undercover meeting, the Defendant deposited the money he had received from the UCA into a bank account he controlled and then wired it, as directed, to the UCA's overseas account. The Defendant also generated a false invoice for the transaction and emailed this document to the UCA as he had volunteered to do. (SOF at ¶ 43.)

The Defendant's comfort with these transactions was such that he continued to launder money for the UCAs even as the unlawful nature of the funds became more serious. Between January 27, 2016, and June 14, 2016, the Defendant had numerous calls and meetings with multiple UCAs, and he ultimately agreed to launder money on behalf of the UCAs on three more occasions. (*Id.* ¶¶ 44–51.) In total, the Defendant made $176,985 in transfers with funds that UCAs had represented were derived from, or were the proceeds of, alien smuggling or firearms trafficking. He did this in exchange for a five-percent commission on each sum of money provided to him for laundering; the equivalent of $7,600 in commissions. (*Id.* ¶ 53.)

As with his involvement in the conspiracy discussed above, the Defendant was not a passive participant in these transactions. He continually reaffirmed his comfort with the sources of the funds in question, and even suggested ways to protect the criminal scheme. For example, in February 2016, the Defendant suggested that he could launder money for the UCAs through a "cover" investment or a currency exchange. (SOF at ¶ 45.) The Defendant also volunteered to use a non-U.S. passport to help the UCAs open an account in the Cayman Islands to avoid scrutiny by the U.S. government, (Ex. D (Feb. 12, 2016 Meeting Trans. at 71:10–77:9), RH-000470–476.) and reassured the UCAs that he was "a different type of attorney" in response to a

comment about how one UCA had "cautioned" another UCA "to be honest with" the Defendant given his status as a lawyer. (*Id.* at 79:17–80:3, RH-000478–79.)

Similarly, in March 2016, the Defendant traveled with an UCA on a private plane to Florida and was given to launder $65,000 from an illegal international arms deal. The Defendant did not blanch at the request or express concerns when shown the purported weapons destined for the "Congo." The Defendant, instead, offered to conduct legal research to better understand potential legal ramifications, and even examined a crate of the firearms, picking up and holding one of the weapons therein. (SOF at ¶ 48.)

## SENTENCING ANALYSIS

### I.      Statutory Maximum Penalties

The Defendant's conviction for conspiracy to commit money laundering carries a maximum term of imprisonment of 20 years and a fine of either $500,000 or an amount not more than twice the amount of the property involved in the transactions. The conviction for substantive money laundering also carries a maximum term of imprisonment of 20 years but a fine of $250,000. Both convictions also require payment of a $100 special assessment, restitution, forfeiture, and a term of supervised release up to three years. (PSR at 2.)

### II.      Guidelines Range

#### A.      Probation's Calculation

Pursuant to § 3D1.2(d) of the U.S. Sentencing Guidelines, the probation officer has grouped the two charges to which the Defendant has pleaded guilty. The probation officer thus has calculated the guidelines range for the Defendant's convictions as follows:

| Guideline | Offense Level |
|---|:---:|
| Base Offense Level of 8 plus 16 based on a total intended loss that was greater than $1,500,000 but not greater than $3,500,000 (§ 2S1.1(a)(2)) | 24 |
| Section 2S1.1(a)(2) applies and the Defendant believed laundered funds were proceeds of an offense involving firearms (§ 2S1.1(b)(1)(B)(iii)) | +6 |
| Section 2S1.1(a)(2) applies and the Defendant was in the business of laundering funds (§ 2S1.1(b)(2)(C)) | +4 |
| Defendant was a manager or supervisor of a criminal activity that involved five or more participants and was otherwise extensive (§ 3B1.1(b)) | +3 |
| Defendant obstructed or attempted to obstruct the administration of justice with respect to the investigation of the instant offense (§ 3C1.1) | +2 |
| Acceptance of responsibility (§ 3E1.1)[1] | -3 |
| **TOTAL** | **36** |

(*Id.* ¶¶ 20–30.)  Based on the defendant's Category I Criminal History, the resulting guidelines range would be **188 to 235 months** of imprisonment.  (*Id.* at 27.)

The government submits that the probation officer's calculation is three levels too low, while the Defendant claims that the calculation is three levels too high.  For the reasons stated below, it is the government's position that the Defendant should receive a four-level leadership role enhancement under § 3B1.1(a) in light of his role in the charged conspiracy and a two-level enhancement under § 3B1.3 for abuse of a position of public or private trust or use of a special

---

[1] The government hereby moves for a third point reduction for acceptance of responsibility under § 3E1.1(b).

skill in light of his conduct with respect to the charged conspiracy and sting operation. Accordingly, if the Court agrees with the government's position, then the defendant's Total Offense Level would be 39 and his resulting guidelines range would be **262 to 327 months** of imprisonment.

### B.    Leadership Role

Section 3B1.1 provides varying enhancements for defendants who served as a leader or manager/supervisor in particular types of criminal activity.  The probation officer has assigned the Defendant a three-level enhancement pursuant to § 3B1.1(b), which applies where a defendant was "a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."  (PSR at ¶¶ 14, 24.)  The probation officer has declined to recommend § 3B1.1(a)'s four-level enhancement, which applies where a defendant was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  According to the probation officer, the four-point enhancement is not warranted in this case because the defendant took direction from another co-conspirator and "did not receive a large share of the fruits of the crime."  (PSR Addendum at 30.)

As an initial matter, there should be no dispute that the criminal conspiracy in which the Defendant participated involved "five or more participants or was otherwise extensive."  Indeed, the Defendant has admitted that the charged conspiracy involved "at least five co-conspirators." (SOF at ¶ 7.)

The question thus is whether the Defendant's role in the criminal conspiracy was more akin to an organizer/leader than a mere manager/supervisor.  The government submits that the answer is the former.  To be sure, the Defendant took direction from a particular co-conspirator and, on occasion, relayed those instructions to the co-conspirators whom the Defendant had

recruited. But, on the whole, the Defendant was the person who decided how to launder the

money and how to respond to challenges to the scheme. Indeed, it was the Defendant:

- who offered up IOLTAs to a co-conspirator for depositing criminal proceeds;

- who decided to recruit other individuals to assist him with the money laundering;

- who directed his recruits as to where they should move the funds they received;

- who opened up additional bank accounts in the face of account closures due to suspected fraudulent activity;

- who decided to generate a "paymaster agreement" in advance of an interview with the FBI.

The fact that the Defendant reported to another co-conspirator does not preclude a finding that

the Defendant acted as a leader or organizer himself. *See* U.S. Sentencing Guidelines Manual

§ 3B1.1 cmt. n.4 (U.S. Sentencing Comm'n 2016) ("There can, of course, be more than one

person who qualifies as a leader or organizer of a criminal association or conspiracy.").

Similarly, the Defendant's share of the fruits of the crime should not be determinative as

to his role in the conspiracy. Whether a conspirator received a small or large share of the fruits

of the crime is but one consideration. Other factors to consider are whether the individual in

question "exercise[d] . . . decision making authority, the nature of participation in the

commission of the offense, the recruitment of accomplices, . . . the degree of participation in

planning or organizing the offense, the nature and scope of the illegal activity, and the degree of

control and authority exercised over others." *Id.* Moreover, a § 3B1.1 enhancement is

appropriate even if the Defendant exercised control over only one other participant in the

criminal scheme. *United States v. Rashwan*, 328 F.3d 160, 166 (4th Cir. 2003) ("Leadership over only one other participant is sufficient as long as there is some control exercised.").

In this case, the Defendant exercised a significant degree of decision making authority and he enjoyed a considerable amount of control over other participants in the scheme. Consider, again, the movement of criminal proceeds in this conspiracy. In four of the six victimizations discussed in the Statement of Facts, money flowed through intermediary accounts—accounts belonging to individuals the Defendant had recruited to the conspiracy— before being transferred to the designated end account. The Defendant, and no one else, orchestrated this laundering structure.

Consider, too, the language the defendant used in directing subordinate co-conspirators. For example, in September 2014, the Defendant sent an email to a co-conspirator that directed her to handle "disbursements on the $27,840.50" by "keep[ing] our 5% ($1,392.00) in the account[,] . . . . distribut[ing] 80% ($22,272.40) via wire transfer" to a particular account, and "distribut[ing] 15% ($4,176.10) via ledger transfer" to a different account. (Ex. E (Redacted Sept. 24, 2014 Email), RH-00004830.) Likewise, in November 2014, the Defendant instructed a different co-conspirator via email to take a number of "actions" with respect to $180,000 that had been remitted to "the Fin International account at Wells Fargo," including wiring $36,400 to a Bank of America account, issuing a cashier's check to the Defendant, and keeping $1,000 as the co-conspirator's cut. (Ex. F (Redacted Nov. 5, 2014 Email), RH-00012825.) These emails, in short, exemplify the Defendant's efforts to control the individuals he had recruited to the conspiracy.

Also instructive is the Fourth Circuit's decision in *United States v. Gonzalez*, 162 F.3d 1156 (4th Cir. 1998) (per curiam). There, two defendants were convicted of conspiring to

transport illegal aliens, in violation of 18 U.S.C. § 371, and seven counts of transporting illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), in connection with their work at a Texas company that paid drivers to transport illegal aliens to locations across the country. *Id.* at *1. On appeal, one of the defendants challenged the district court's application of § 3B1.1(a) to her offense level, apparently arguing that she was ineligible for an organizer or leader enhancement because she took direction from her brother-in-law. The Fourth Circuit, however, upheld the district court's decision. It observed that the defendant managed the company's office and dispatched, instructed, and paid the drivers, and found these facts sufficient to support the § 3B1.1(a) enhancement even if the defendant "may have reported to her brother-in-law for instructions." *Id.* at *2.

The logic of *Gonzalez* applies equally here. The Defendant's recruitment efforts combined with the directions he dispensed is determinative and outweighs the fact he received instructions from another co-conspirator or the fact his share of the fruits of the crime was relatively small. The Court, therefore, should add § 3B1.1(a)'s four-level enhancement to the Defendant's guidelines calculation.

C.      **Abuse of Position / Use of a Special Skill**

Section 3B1.3 provides for a two-level enhancement where a defendant "abused a position of public or private trust, or used a special skill, in a manner that significant facilitated the commission or concealment of the offense." Commentary to the Guidelines explains that a "position of public or private trust" is one that is "characterized by professional or managerial discretion" and that persons holding such positions "ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S. Sentencing Guidelines Manual § 3B1.3 cmt. n.1 (U.S. Sentencing Comm'n 2016). In

13

addition, the Fourth Circuit has added its own gloss, explaining that "the question of whether a defendant held a position of trust must be approached from the perspective of the victim." *United States v. Gordon*, 61 F.3d 263, 269 (4th Cir. 1995).

As stated previously, the government believes that the enhancement under § 3B1.3 should apply. This is so for two reasons. First, the Defendant's status as a licensed attorney in Georgia and Washington, D.C., at the times of the relevant conduct, makes it "a given" that he "occupie[d] a position of public trust." *United States v. Harrington*, 114 F.3d 517, 519 (5th Cir. 1997) (explaining that "lawyers represent not only the interests of clients, but the interests of our entire judicial system, indeed the interests of our society," and, as a result, "it cannot be gainsaid that lawyers occupy a position of public trust"); *see also United States v. Post*, 25 F.3d 599, 600 (8th Cir. 1994) (concluding that a defendant's "status as a licensed Arkansas attorney placed him in a position of public trust" because "[a] license to practice law accords to the recipient certain powers and privileges not available to the general public"). This is because, by flouting the duties and privileges attendant to a law license, a lawyer victimizes and "gravely undermine[s]" the state bars and citizens who granted him or her "the positions of trust and privileges of trust that society reposes in them." *United States v. Foster*, 868 F. Supp. 213, 216 (E.D. Mich. 1994).

Second, the facts establish that the Defendant abused his position of public trust and used his legal skills to significantly facilitate the commission and concealment of his money laundering activities. The Defendant made it known to the people for whom he was laundering money that he was an attorney and did not hesitate to use his IOLTAs to launder the criminal proceeds he received. For instance, in a July 18, 2014 email to a co-conspirator, the Defendant provided account information corresponding to "current banks to use" for deposits and

specifically noted that two of the accounts were "Attorney Trust Account(s)."  (Ex. G (Redacted July 18, 2014 Email), RH-00004868–71.)  Moreover, the Defendant believed that his position as an attorney and his legal skillset insulated him from criminal liability.  This is evident from a recorded conversation with UCAs in December 2015 during which the Defendant revealed that he viewed his IOLTAs as bulwarks against government scrutiny of his transactions.  Asked whether he could help move money from the United States to an overseas account, the Defendant opined that it is necessary to "have a good business reason you can use as a cover," volunteered that he had "been using a[n] . . . attorney escrow account" to avoid U.S. taxes, and offered to deposit the UCA's money "in [his] escrow account."  (Ex. H (Excerpted Dec. 10, 2015 Meeting Trans. at 22:2–23:24), RH-00001284–85.)  In addition, the defendant did not hesitate to offer the UCAs his legal research skills in order to assist them in ascertaining the exposure they faced for their criminal activities.

The Defendant, in short, believed that his attorney status and knowledge would insulate him from scrutiny.  This mindset is important to the question of whether § 3B1.3 should apply because it reveals that the Defendant's money laundering methods, such as using IOLTAs, was not done by happenstance.  *Cf. United States v. Weisberg*, 297 F. App'x 513, 516 (6th Cir. 2008) (declining to apply § 3B1.3 on the basis of an attorney's use of an IOLTA because "the crime at bar simply involved the choice of an account and was not made easier by [the defendant's] legal training").  The Defendant, instead, operated with the knowledge that his actions as a licensed attorney would enjoy "a presumption of regularity," *Post*, 25 F.3d at 601, and "legality," *Harrington*, 114 F.3d at 519.  Application of § 3B1.3's two-level enhancement, therefore, is appropriate in this case.

## III.    Sentencing Recommendation

As the Court is well aware, it must consult both the U.S. Sentencing Guidelines and the sentencing factors set forth in 18 U.S.C. § 3553(a) to determine the appropriate sentence for the defendant.  Although the Sentencing Guidelines are advisory, district courts are required to "consult those Guidelines and take them into account when sentencing."  *United States v. Booker*, 543 U.S. 220, 264 (2005).  As the Fourth Circuit has explained, district courts are to "first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines.  Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence."  *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) (citation omitted).[2]

Here, regardless of the Court's guidelines range calculation, the government submits that a sentence at the low-end of the applicable guidelines is supported by several of the § 3553(a) factors, particularly the need for a sentence that reflects the seriousness of the counts of conviction, that promotes respect for the law, and that adequately deters the Defendant and others from perpetrating similar crimes.

---

[2]  The § 3553(a) factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed training, medical care, or other treatment; the kinds of sentences available; the kinds of sentence and the sentencing range established for the type of offense committed; any pertinent policy statement; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

**A.      The Sentence Should Reflect the Seriousness of the Counts of Conviction.**

The sentence that the Court imposes should take into account the extent of the harm caused by the Defendant's conduct.  Doing so, however, is admittedly difficult, particularly with respect to the conspiracy conviction.  It, of course, is possible to quantify the amount of money that the Defendant and his co-conspirators intended to launder (*i.e.*, $2,918,658.97), the amount of money that they actually laundered (*i.e.* $2,143,339), and the amount of loss suffered by the victims (*i.e.*, $2,034,764.06).[3]  Yet, none of these astounding figures truly capture the havoc wrought by the Defendant's actions.

Money laundering, at its core, is the criminal's way of ensuring that crime pays.  This principle is true here.  The Defendant's money laundering activities ensured that his co-conspirators would be able to keep the money they stole.  The quick, multiple transactions that the Defendant orchestrated thwarted victims' efforts to call back the funds they had been duped into wiring.  And, once the money was safely in the hands of the Defendant's co-conspirators, they were free to use it as they pleased.

It also is important to note that the Defendant's criminal conduct exacted a toll beyond just lost funds.  Unraveling the extent of the damage stemming from the charged conspiracy has required untold hours of work by government officials and victims.  The Defendant's money laundering also posed a greater macro harm.  To the extent it hindered the U.S. government's ability to collect tax revenue, the Defendant's conduct indirectly harmed the honest taxpayers of

---

[3] The latter figure—the amount of loss incurred by the victims—is 27 cents lower than the losses specified in the Statement of Facts.  This is because, in drafting the Statement of Facts, the government: (a) did not include $11,754.42 incurred by B.A. in engaging with law enforcement about the crime in an effort to be consistent with application note 3(D)(ii) of Section 2B1.1 of the Sentencing Guidelines; and (b) transposed the last two digits of the resulting sum, writing that B.A.'s loss was $247,906.30 instead of $247,906.03.

the United States. Equally concerning is the fact that the Defendant helped move money into overseas accounts for which it is unknown what purpose the funds might have been used for next.

**B.      The Sentence Should Promote Respect for the Law.**

A significant sentence also is needed to address the brazenness of the Defendant's conduct. Despite bank account closures and two FBI interviews, the Defendant continued to launder money. Although the Defendant's decision to enter a pre-complaint and pre-indictment plea reflects his acceptance of responsibility, it is troubling that a criminal prosecution was necessary to stop the Defendant's conduct. The ease by which the Defendant lied to the FBI and his comfort with the criminality of the UCAs suggest that the Defendant viewed himself as being above the law. Moreover, such a mindset and course of conduct is the antithesis of what is expected of individuals who choose to pursue a career in the law. As a result, the government asks the Court to craft a sentence that adequately ensures respect for the law.

**C.      The Sentence Should Be Sufficient to Deter the Defendant from Reoffending and Others from Engaging in Schemes Like the Defendant's.**

Finally, a significant sentence is necessary to for both general and specific deterrence. This is particularly so given the Defendant's use of his status as an attorney to further his criminal schemes. While many industries have numerous levels of oversight, the legal profession in many ways operates as an honor system. Ostensibly, this is a byproduct of the sanctity of the attorney-client privilege and our justice system's commitment to zealous advocacy. The work of attorneys generally is inviolable, in part because there is an expectation that attorneys will operate within defined legal and ethical boundaries.

This is why an attorney's decision to flagrantly violate the trust bestowed upon him or her is not just an individual failing. It calls into question the legitimacy of our justice system and the honesty of those who are supposed to be her protectors.

As a result, a meaningful sentence is necessary here. If a defendant who is supposed to uphold the law is not adequately held accountable for breaking it, then lawyers and non-lawyers alike will question the equity of adhering to the law themselves. Conversely, imposing a sentence within the Guidelines will reaffirm that crime does not pay, no matter who you are. Such a sentence, moreover, will send a clear message to the Defendant specifically and the community generally that money laundering is a serious offense that will not be tolerated.

## IV.    Restitution

As set forth in the Plea Agreement, the Defendant has agreed to an entry of a restitution order for the full amount of the losses incurred by individuals and entities victimized by the conduct described in the Criminal Information. The Defendant also has agreed that, at a minimum, a number of specific individuals suffered losses and are entitled to restitution. (*See* Plea Agreement at ¶ 8.)

Although a victim is not required to submit a statement or proof of loss or otherwise participate in the process for determining restitution, *see United States v. Aman*, 616 F. App'x 612, 614 (4th Cir. 2015) (per curiam), victims B.A., M.G., and F.F. have chosen to submit supporting documentation for their restitution claims and this information has been provided to the Court via the U.S. Probation Office. To date, no other identifiable victims have provided documentation to the government in support of a claim for restitution.

The parties have conferred and have reached agreement on a proposed restitution order, which will be submitted to Court at sentencing. Unless the government receives additional

restitution requests from qualifying victims, the parties will ask the Court to enter a total restitution order of $**2,046,518.48**.

Two aspects of this figure should be noted. First, it is less than the amount contemplated by the Plea Agreement. This is because, after the Plea Agreement and Statement of Facts were entered in this case, it was determined that the Plea Agreement erroneously identified victims F.F. and J.D. as both being eligible for $185,000 in restitution. As correctly reflected in the Statement of Facts, only F.F., J.D.'s investment firm, (and not J.D.) bore a loss in the amount of $185,000. (*See* SOF at ¶ 34.)

Second, the contemplated restitution award includes more restitution for B.A. than what is set forth in the Plea Agreement. This is because B.A. has provided documentation showing that it suffered a loss of $259,660.45, and the parties agree that B.A.'s claimed losses are fully compensable under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A.

## CONCLUSION

For the reasons stated above, the government submits that a sentence at the low-end of the properly calculated Guidelines—which the government believes are **262 to 327 months**—is sufficient but not greater than necessary to satisfy the sentencing factors in § 3553. The government also asks that the Court impose an appropriate term of supervised release and the agreed-upon restitution.

Respectfully submitted,

Dana J. Boente
United States Attorney

By: _____/s/_____
Alexander P. Berrang
Assistant United States Attorney
U.S. Attorney's Office
2100 Jamieson Ave.
Alexandria, Virginia 22314
Tel: (703) 299-3700
Alexander.P.Berrang@usdoj.gov

James S. Yoon
Ryan K. Dickey
Senior Counsels
U.S. Department of Justice
Computer Crime and IP Section
1301 New York Ave., NW, Suite 600
Washington, DC 20530
Tel: (202) 514-1026

Kendrack D. Lewis
Trial Attorney
U.S. Department of Justice
Money Laundering & Asset Recovery Section
1400 New York Ave., NW
Washington, DC 20005
Tel: (202) 616-2345

**CERTIFICATE OF SERVICE**

I hereby certify that on January 26, 2018, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send a notification of filing ("NEF") to

counsel of record for the defense.

I also certify that on January 26, 2018, I will send a true and correct copy of the foregoing

by e-mail to the following:

Nina S. Blanchard
Senior U.S. Probation Officer
Nina_Blanchard@vaep.uscourts.gov

By: _____/s/_____
Alexander P. Berrang
Assistant United States Attorney
U.S. Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299-3981
Alexander.P.Berrang@usdoj.gov