IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 1:17-cr-215 |
| v. | ) | |
| | ) | |
| RAYMOND JUIWEN HO, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S POSITION ON SENTENCING

Defendant Raymond Juiwen Ho, by and through counsel, hereby submits this memorandum in aid of sentencing.

## INTRODUCTION

Mr. Ho worked with others to launder funds derived from an illegal scheme to defraud victims and attempted to launder funds he believed to be the proceeds of an illegal scheme to smuggle goods from the United States.  He recognizes the serious nature of the offenses he has committed and accepts complete responsibility for his actions.  Mr. Ho has been devoted to making amends for his actions by owning up to what he did, making himself available for multiple extensive proffer sessions with the government, and pleading guilty.  He has also spent a considerable amount of time reflecting on his conduct, including the harm it caused to victims of the underlying fraud and the pain and dishonor it has brought to his family, and charting a plan for the future.

Mr. Ho is genuinely remorseful for what he did and acknowledges that some period of incarceration is appropriate.  He respectfully requests that the Court take into account the nature of the offense as well as his demonstrated contrition, background, character, and plans for the future in imposing a sentence substantially below the guidelines.

**BACKGROUND**

Mr. Ho's Family and Career

As noted in the presentence report ("PSR"), Mr. Ho was born in Taiwan in 1969. PSR at 3. He is one of three children born to Chuen Yuan Ho and Chen-Cheng Ho . *Id.* ¶ 38. At the age of 11, he and part of his family moved Georgia, where he spent the rest of his childhood and attended college at Georgia Tech and law school and Georgia State University. *Id.* ¶¶ 39, 51. After earning an LL.M. from John Marshall Law School in Chicago in 1995, Mr. Ho began a career as an intellectual property ("IP") lawyer with a number of law firms, including Venable, Hogan Lovells, and Arent Fox. *Id.* ¶¶ 54-56. Since 2013, he has been with IP Law Leaders, a Washington, DC area IP law boutique. *Id.* ¶ 53.

Along the way, Mr. Ho married Alice (Tseng) Ho, an optometrist, with whom he has two sons, ages 10 and 12. *Id.* ¶¶ 43, 44. Last summer, Mr. Ho and his wife separated, i*d.* ¶ 43, and are now in divorce proceedings.

Search for Additional Sources of Income

Mr. Ho moved from one law firm to another with some frequency, often because of client conflicts or internal business development disputes, but for many years had a comfortable income. He saw a significant decrease in his compensation, however, beginning several years ago, and started to feel financial pressure caused by the lifestyle to which his family had become accustomed. As result, he began to look for opportunities on the side that would provide him with supplemental income.

Mr. Ho actively searched for business opportunities by tapping into an extensive community of like-minded, seemingly entrepreneurial individuals. At various times, he attempted ventures involving, among other things, raising eels for export to Asia, tuna fishing,

brokering the sale of distressed banks, selling train rails for scrap metal, recycling copper, and brokering the sale of a Chinese restaurant in Maryland.  His role in these endeavors was to serve as a middleman, connecting sellers and buyers, particularly within the Asian community where introductions and referrals are vital.  Through his network of contacts—some legitimate entrepreneurs and some with dishonest intentions—he was approached regularly to take part in deals involving various banking instruments such as standby letters of credit, international bills of exchange (IBOEs), irrevocable corporate purchase orders (ICPOs), irrevocable conditional bank pay orders (ICBPOs), MT103 international wire transfers, server-to-server transfers (S2S), grey screen transactions, and key telex transfers (KTTs).  Mr. Ho had little understanding of what any of these instruments were but spent a considerable amount of time and effort pursuing transactions involving them, again as a middleman.  While financial institutions may have employed some of these instruments or processes in the past, they are largely outdated and seldom, if ever, still used.  Nonetheless, an Internet search reveals they remain popular among online scammers.[1]

    None of the various ventures Mr. Ho pursued proved successful, that is, with the exception of one: so-called "paymaster" services.

    The concept of a paymaster is simple.  One serves a neutral, disinterested party who holds funds related to an underlying transaction until the deal has settled and then distributes those funds according to the parties' instructions.  All a paymaster needs is an email address and a bank account—along with transactional documentation and a money transmitter license.

_____

[1] *See, e.g.,* Press Release, Federal Bureau of Investigation, FBI Warns Public About Platform Trading Investment Scams (Jan. 5, 2015), available at https://www.fbi.gov/contact-us/field-offices/honolulu/news/press-releases/fbi-warns-public-about-platform-trading-investment-scams.

Introduction to Chief Onwa

The primary perpetrator of the scheme before the Court is an individual known only as "Chief Onwa."  In approximately 2013, a member of Mr. Ho's community of Internet contacts introduced him to Chief Onwa.  Over time, Mr. Ho communicated with this individual by telephone, email, and Skype audio but, to this day, has never met or even seen him.  It is believed he is located overseas, possibly in Africa.[2]

After the introduction, Chief Onwa asked Mr. Ho to cash two checks, each in the amount of $30,000, explaining that checks drawn on U.S. banks, as these were, were hard to cash outside the United States.  Mr. Ho deposited one check, which, after three days, appeared to have cleared.  Mr. Ho then deposited the second check and, at Chief Onwa's direction, wired the proceeds of both back to him.  Mr. Ho's bank soon informed him, not surprisingly, that the checks were fraudulent, attempted unsuccessfully to recall the funds, and ultimately closed his account while keeping the account balance.  Mr. Ho brought this to the attention of Chief Onwa, who offered what Mr. Ho wanted to believe was a legitimate explanation as to why the checks were bad.  While Mr. Ho advised Chief Onwa he would no longer take part in transactions involving checks, in an effort to recoup through commissions the funds the bank had kept, he foolishly agreed to facilitate additional transactions as long as they involved wire transfers on the belief that banking procedures related to wired funds would render such transactions safe.  This was the first of countless red flags Mr. Ho chose to ignore.  Before long, Mr. Ho became involved in a set of fraudulent schemes that was larger than he could have ever anticipated.

---

[2] It appears the government has devoted extensive resources to this investigation, presumably in an effort to develop evidence against and apprehend, among others, Chief Onwa and any other ringleaders.  Unfortunately, to date those individuals have not been brought to justice.

Money Laundering Activity

Mr. Ho continued to work with Chief Onwa in the hope that there would be a "good,"
that is, legitimate, transaction.  There never was.  He began a practice of receiving funds Chief
Onwa caused to be sent and transferring those funds to multiple other accounts in ways that had
no economic purpose.  The banks where Mr. Ho maintained the accounts he used for these
transactions, including IOLTA accounts, frequently reversed incoming wires, froze Mr. Ho's
funds, and closed his accounts.  Despite these additional red flags, Mr. Ho was still willing to
look the other way and continue working with Chief Onwa, including attempting to recoup the
funds he had lost earlier.

In exchange for his efforts, Mr. Ho was paid a commission that averaged approximately
five percent of the funds involved in the transactions.  His total remuneration was $218,980.

After a period of time, Mr. Ho introduced two others to the Chief Onwa transactions: an
individual in California he had met through his network of Internet contacts and a fellow
Washington-area IP attorney.  Mr. Ho served as a go-between, receiving instructions from Chief
Onwa about where to send incoming funds and then relaying those directions to the others.  After
these individuals had connected with Chief Onwa, funds were transferred directly from victims'
accounts to accounts they controlled.

Sting Operation

In November 2015, the government initiated an undercover operation that involved two
fact patterns.  In one set of transactions, undercover agents told Mr. Ho they were engaged in
smuggling illegal aliens into the United States.  In the other set of transactions, agents stated they
were selling rifles to a customer in Kenya and the Congo and, during a visit to a warehouse in
Florida, displayed several crates of rifles to Mr. Ho.  He agreed to receive funds he believed had

derived from these activities and transferred those funds according to the agents' instructions.
For his efforts, Mr. Ho was paid $7,600.

## POSITION ON PRESENTENCE REPORT AND CALCULATED GUIDELINES

Mr. Ho disagrees with the presentence report's calculation of an offense level of 36 and
submits that the appropriate offense level is 33, with a corresponding advisory guidelines range
of 135 to 168 months.

### The Manager/Supervisor Enhancement Is Not Warranted.

Mr. Ho objects to the presentence report's role adjustment under § 3B1.1 of the U.S.
Sentencing Guidelines.  The PSR's guidelines calculation includes a three-level enhancement
pursuant to § 3B1.1(b) on the ground that Mr. Ho served as a manager or supervisor.  The
government goes a step further, arguing for a four-level enhancement under § 3B1.1(a) on the
theory Mr. Ho was a leader or organizer of the criminal activity.

A role adjustment under § 3B1.1 is not warranted.  Mr. Ho was an order-taker not a
manager or supervisor, let alone a leader or organizer.  The facts developed in the government's
investigation reveal that Mr. Ho had no role on the front end of the scheme—that was entirely
the responsibility of Chief Onwa (and possibly others)—nor did he control the ultimate
disposition of the funds.  Chief Onwa organized and executed the underlying fraud and directed
where the funds ultimately were to go and how they were to get there.  At their request, Mr. Ho
introduced two others with whom he was regularly in search of business opportunities to Chief
Onwa, who then deposited fraudulent proceeds directly into accounts they controlled.  Beyond
that, and as noted in the PSR, Mr. Ho's role was limited to following Chief Onwa's directions
and passing those directions on to others.  PSR at 30.  His interactions with these individuals did

not involve management, supervision, or recruitment and falls far short of leading or organizing criminal activity.  Rather, Mr. Ho was merely a conduit through which instructions passed.

In the Fourth Circuit, courts are to use "the dictionary definition" of the term manager: "'a person whose work or profession is the management of a specified thing (as a business, an institution, or a particular phase or activity within a business or institution).'" *United States v. Slade*, 631 F.3d 185, 190 (4th Cir. 2011) (quoting *United States v. Chambers*, 985 F.2d 1263, 1268 (4th Cir.1993)).  The Fourth Circuit has also observed that "*Random House* defines 'manager' as 'a person who has control or direction of an institution, business, etc., or of a part, division or phase of it,' and Oxford defines 'manager' as '[o]ne whose office it is to manage a business establishment or a public institution.'" *Chambers*, 985 F.2d at 1268 (quoting *The Random House Dictionary of the English Language* 1166-67 (2d ed. 1987), 6 *The Oxford English Dictionary* 106 (1933)).  A manager, then, is someone who exercises control or direction over a business, neither of which Mr. Ho did.

In *Slade*, the defendant delivered drugs directly to customers as well as to others who then sold the drugs to their customers, but there was no evidence that the defendant "exercised any supervisory responsibility over these persons by controlling them or directing the terms of their sales;"  a co-conspirator drove the defendant to various locations to deliver drugs, but there was "no indication from the record that the co-conspirator did so pursuant to or as a result of any exercise of managerial or supervisory authority" by the defendant; and "various co-conspirators sold drugs 'for' [the defendant], [but] there is simply no evidence in the record that [the defendant] had any involvement in those sales beyond that of supplying the drug." *Slade*, 631 F.3d at 191.  The Fourth Circuit held that the district court erred in concluding the defendant exercised authority over co-conspirators or managed the conspiracy's activities. *Id.* Just as the

7

defendant in that case did not set, control, or direct the terms of the sales, Mr. Ho did not set the wire transfer terms but rather passed on instructions from Chief Onwa, who had the authority to set the terms of the transactions.  Accordingly, Mr. Ho did not function as a manager or supervisor of the criminal activity as contemplated by the enhancement.

The Abuse of a Position of Trust or Use of Special Skill Enhancement Is Not Warranted.

Although the presentence report, appropriately, does not include a two-level enhancement for the abuse of a position of trust or use of a special skill under § 3B1.3 of the guidelines, the government is advocating for one.  That enhancement applies where "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  USSG Manual, § 3B1.3.  As the presentence report notes, there was no public or private trust Mr. Ho violated during the course of this offense nor did his position as a lawyer afford him any special skill with respect to the offense. PSR at 30.

In support of its contention that the enhancement applies, the government points to the fact that Mr. Ho used an Interest on Lawyers Trust Account ("IOLTA") to transfer funds stolen from one of the victims, M.G.  The government argues the use of that account supports the enhancement because only lawyers can open such accounts.  The government also claims Mr. Ho's statement to an undercover agent that he would research export laws during a conversation about smuggling firearms outside the U.S. supports the enhancement.

The use of an IOLTA had no particular bearing on the offense.  It was one of several accounts Mr. Ho used for the purpose of receiving and sending funds.[3]  He also used non-

---

[3] As noted in the presentence report (PSR ¶ 11 at 8-9) and the statement of facts (Docket No. 9 at 1-3), during the relevant time period, Mr. Ho owned and controlled 13 bank accounts.  Some were in his name, and some were in the name of a business.  Some were domestic while others were international.  Some were IOLTAs, and some were not.

IOLTAs, and they worked just as effectively as the IOLTA.  *See, e.g.,* Exhibit ("Ex.") 1 at 2-6 (transcript of February 16, 2016 telephone conversation between Mr. Ho and an undercover agent in which it is ultimately agreed that Mr. Ho will open a personal account); Ex. 2 (email to Chief Onwa listing accounts seven accounts available for use, two of which are IOLTAs and five of which are not).  Because banks frequently closed Mr. Ho's accounts due to fund recalls, Mr. Ho used whatever accounts were still available to him.  On one occasion, such an account happened to be an IOLTA.  *See United States v. Weisberg*, 297 F. App'x 513, 516 (6th Cir. 2008) (declining to apply § 3B1.3 on the basis of an attorney's use of an IOLTA by finding that his use of such account "instead of an escrow account, a savings account, an offshore bank account, or cash underneath his mattress, is immaterial").

In addition, Mr. Ho's statement that he would research export laws during a conversation about smuggling weapons outside of the country has no relevance to the money laundering offenses of which he has been convicted.  In the fact pattern devised by the government, the individuals for whom Mr. Ho believed he was laundering funds had already decided to sell arms illegally.  Mr. Ho's role was to launder the proceeds of the sales.  Volunteering to look into the laws related to the exportation of firearms had nothing to do with laundering funds.  It did not significantly—or otherwise— facilitate the money laundering offense, nor, for that matter, did it facilitate a gun smuggling offense since neither Mr. Ho nor the undercover agents ever followed up on his offer let alone rely upon any such research.

Specifically, in discussions with the undercover agents about his position as an attorney, Mr. Ho made it clear his practice area had nothing to do with the scheme, including his role in it. During a March 8, 2016 conversation with an undercover agent on a flight to Fort Lauderdale, the agent stated that initially he was concerned about whether Mr. Ho could be trusted because

was an attorney.  *See* <u>Ex. 3</u> at 33, 37.  Mr. Ho then found himself in a position where he had to

explain that he could be trusted *despite* his status as an attorney.  *Id.*  He began by clarifying he

was a patent attorney who "basically deal[s] with technology, tech companies. . . .  Inventions

and things like that."  *Id.* at 33-34.  He further explained that he was trying transition away from

law and more to business.  "I've been sort of shifting going to a more business aspect."  *Id.* at 35.

Upon meeting another undercover agent once he arrived in Fort Lauderdale, Mr. Ho

again explained, "I'm a patent -- patent attorney," and that he "[d]eal[s] with technology."  *See*

<u>Ex. 4</u> at 14.  In response to the Fort Lauderdale undercover agent's surprised reaction, the

undercover who accompanied Mr. Ho on the flight earlier that day quickly assured his colleague,

"He's one of us, don't worry about it."  *Id.* at 15.  At no point, did Mr. Ho use—or even

promote—his status as a lawyer to facilitate the offense.  Indeed, as the conversations outlined

above make clear, his profession, if anything, was a liability rather an asset.

<u>**SENTENCING ARGUMENT**</u>

Mr. Ho fully recognizes the gravity of his offenses.  He is genuinely remorseful and

ashamed for contributing to the harm the offense caused to the victims and understands that a

term of incarceration is appropriate.

Mr. Ho, however, he is not the malevolent and hardened criminal the guidelines range

would suggest or that the government seems to want to make him out to be.  He is a first-time

offender with a long history of making positive contributions to his family, his community, and

his clients.  As the record before the Court makes clear, the offense conduct was entirely out of

character for Mr. Ho, a fact the Court should take into account in crafting a just sentence.  *See*

*United States v. Smith*, 275 F. App'x 184, 186 (4th Cir. 2008) (sentence significantly below the

guidelines range was not an abuse of discretion where defendant had "lived an exemplary life to this point . . . full of noteworthy activities") (internal quotation marks omitted).

## SECTION 3553(a) FACTORS

As this Court is aware, sentencing courts must take into account the statutory sentencing factors set forth in 18 U.S.C. § 3553(a) by imposing a sentence sufficient, but not greater than necessary, to comply with the purposes set forth therein, that is,

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

Section 3553(a) directs courts to consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory sentencing purposes reflected above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

Nature and Circumstances of the Offense and Defendant's History and Characteristics

Money laundering is a serious offense. This conduct serves to conceal the source of illicit funds, thereby making it more difficult to link criminal proceeds to the underlying offense and to recover those proceeds. The offense contributes to the harm visited upon innocent victims. As reflected in his letter to the Court, Mr. Ho fully appreciates this. *See* Ex. 5.

11

It is important for the Court to understand how Mr. Ho, a kind, intelligent, and hard-working IP lawyer, got caught up in this offense.  Mr. Ho did not set out to join in a scheme to defraud victims.  He was approached—as, unfortunately, many are—to take part in a check scam.[4]  Foolishly, he fell for it, and cashed two checks provided by Chief Onwa.  Even more foolishly, however, he continued to work with this nameless and faceless swindler, eventually observing, but choosing to ignore, one red flag after another.  What exactly led Mr. Ho to press on in the face of increasing warning signs is difficult to comprehend.

Mr. Ho has no criminal history.  Apart from the aberrant conduct at issue in this case, he has led a law-abiding life.  He has led a productive life.  Mr. Ho took an engineering and legal background to develop a sophisticated intellectual property practice.  He is good at what he does: helping clients resolve complex patent disputes.  Current and former professional colleagues provide insight into the manner in which Mr. Ho approaches his work and treats others as well as the confidence they still have in him.

Law partner Cameron Tousi has known Mr. Ho since they first worked together in 1995. He describes Mr. Ho this way:

> In all that time, and indeed all the years I have known him, I have laid witness to a man of the highest integrity and honesty.  Raymond treats his clients, colleagues and fellow counsel, including adverse counsel, with the utmost thoughtfulness and respect.  I have never seen him deceive others overtly or even stretch the truth.  To-date, I have yet to see him raise his voice, lose his temper, disrespect others or even hurt another's feelings, so thoughtful is this gentleman; would that we could honestly say the same of everyone particularly in the oft-contentious legal profession.

Ex. 7 (character letters).  Other professional associates echo those sentiments, describing Mr. Ho as "well regarded as being conscientious and a person of integrity, at the firm" (letter from

---

[4] Mr. Ho continues to receive email solicitations from scammers, some known to him through his network of Internet contacts and some unknown.  These nonsensical emails typically ask Mr. Ho to serve as a middleman in some fashion, for example by making introductions.  *See* Ex. 6 for several recent examples of such solicitations.

former law partner Ralph Albrecht), "caring and considerate of others as a human being" (letter from former administrative assistant Sheila Jallow), "an honest person with high integrity" (letter from former co-counsel Emmanuel A. Rivera), and "a trusted friend" whose offense "is inconsistent with his character" (letter from former law partner Andrew C. Aitken). *Id.*

The letters submitted by other friends and family members speak further to Mr. Ho 's character. Throughout his life, he has undertaken to do well by others. The letters contain numerous examples of instances in which Mr. Ho has offered his selfless assistance to those in need and undertaken to be a supportive father and good role model for his sons.

As noted in the letter from Deborah Lin, Mr. Ho's sister, as a student helping his parents manage two rental properties near the Georgia Tech campus, Mr. Ho would help the tenants, many of whom were foreign students, by giving them rides and assisting with course selection, grocery shopping, and visa extensions. *Id.* As an active member of the Organization of Chinese Americans and the Hakka Association for the Greater Washington Area, Mr. Ho has helped older members of the local Chinese community register to vote and has provided pro bono legal services to fellow members. *Id.* (letters from Lincoln Cheng and Jouhn-Wern Jang). Mr. Ho's brother-in-law, Cho-Liang Lin, describes a time when Mr. Ho traveled to New York and spent three days helping Mr. Lin's elderly mother prepare for a move to Houston. *Id.* He has shown compassion and generosity by providing dinner, overnight accommodations, and breakfast to a woman and her two young children stranded at a bus station during a snowstorm. *Id.* (letter from Su and Robert Weems). Two years ago, after the home of his brother, James Ho, burned down, Mr. Ho "was instrumental in helping us cope with the traumatic aftermath, including complex insurance claims, fire investigation reports, and subsequent legal issues." *Id.*

Over the years, Mr. Ho focused much of his attention to raising his 10 and 12 year-old sons.  Longtime family friend Dorothy Brodmann describes him as "an exceptional" and "devoted hands-on father" who "is instrumental in shaping these boys into equally impressive humans," including by helping them with their academics, supporting their athletic pursuits, and sharing in recreational and cultural experiences with them.  *Id.*  He enjoys teaching his sons to canoe on the Chesapeake, "patiently help[s] them with their fishing rods," and "never misses violin recital."  *Id.* (letters from Andrew C. Aitken and Cameron H. Tousi).

The comments of these individuals are a testament to the quality of Mr. Ho's character. They describe a man who has attempted to lead a good life.  They reveal the crimes he has committed and for which he stands before the Court in judgment are an aberration that are not reflective of his core values or future potential.

Statutory Purposes of Sentencing

Money laundering is a serious offense.  A term of incarceration significantly below the guidelines reflects the severity of the crime.  For an individual like Mr. Ho, that is, a first-time offender who recognizes what he did was wrong, who has taken responsibility for his actions, who has otherwise led an honorable life, and who intends to make the most of the rest of his life, meaningful term of incarceration that is significantly below the guidelines will promote enormous respect for the law and provide just punishment.

A substantially below-guidelines sentence will afford adequate deterrence, both general and specific.  Such a sentence is a significant amount of time to be away from loved ones and unable to make a positive contribution to society.  With regard to specific deterrence, there is no need to protect the public from further crimes committed by Mr. Ho as the record strongly

suggests he will never engage in this type of conduct in the future.  It goes without saying that he has learned his lesson and learned it well.

Kinds of Sentences Available

Because neither 18 U.S.C. § 1956(h) nor 18 U.S.C. § 1956(a)(3) include a statutory minimum, this Court may impose a sentence significantly below the guidelines range.

Kinds of Sentences and Sentencing Range Set Forth in the Guidelines

As discussed in above, Mr. Ho objects to the inclusion of a three-level enhancement for USSG § 3B1.1(b) (PSR ¶ 24) and disputes the government's position that a two-level enhancement for the abuse of a position of trust or use of a special skill under USSG § 3B1.3.

Accordingly, the offense level should be 33, which corresponds to a sentencing range of 87 to 108 months.  Given that the sentencing guidelines are advisory, *United States v. Booker*, 543 U.S. 220 (2005), however, the Court is free to craft a sentence outside that range.  In carrying out its obligation to "make an individualized assessment based on the facts presented," a sentencing court may deviate from the guidelines based on policy considerations or because the guidelines fail to reflect the § 3553(a) factors.  *United States v. Mondragon-Santiago*, 564 F.3d 357, 360 (5th Cir. 2009).

There are two elements of the guidelines calculation the Court should take into account in determining the weight to be accorded to the guideline range: the loss amount and the enhancement for laundering the proceeds of a firearms offense.

In this case, the loss amount of more than $1.5 million but not more than $3.5 million has the effect of increasing the offense level by 16.  PSR ¶ 20.  This Court is free to impose a sentence below the guidelines range, particularly when the guidelines fail to accurately state the severity of the offense.  *See, e.g., Rita v. United States*, 551 U.S. 338, 351 (2007) (noting that a

sentencing court may find that a case falls outside of the "heartland" contemplated by the guidelines, or that "the case warrants a different sentence regardless").  Here, an individualized assessment of Mr. Ho makes clear that the advisory guidelines range is inappropriate, and a sentence significantly below the guidelines fully satisfies the statutory goals of sentencing.

Mr. Ho's loss-driven advisory range warrants a downward departure because the offense level determined under the guidelines "substantially overstates the seriousness of the offense."  USSG § 2B1.1, App. Note 20(C) (acknowledging that "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense" and that, in those cases, "a downward departure may be warranted").  Indeed, the guidelines have long been the subject of criticism for their overemphasis on loss factors, with judges, lawyers, and other commentators calling for "a reassessment of § 2B.1's 'inordinate emphasis' on the amount of loss caused by an offense."  David Debold & Matthew Benjamin, Losing Ground, *In Search of a Remedy for the Overemphasis on Loss and Other Culpability Factors in the Sentencing Guidelines for Fraud and Theft*, 160 U. PA. L. REV. 141 (2011); *see also United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (criticizing the way the guidelines approach monetary offenses and finding that "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence.").

Here, the estimated loss factor increases Mr. Ho's offense level from 8 to 24.  The Court should drastically discount the loss factor in this case to avoid subjecting a nonviolent first-time offender, who poses no threat to the public and no real risk of recidivism and who is subject to substantial collateral consequences as a disbarred attorney, to the same sentence as

violent criminals.  *See, e.g., United States v. Parris*, 573 F. Supp. 2d 744, 754-55 (E.D.N.Y.

2008) (acknowledging that because the Supreme Court has allowed district courts to impose a

variant sentence based solely on disagreements with the guidelines, the guidelines in the context

of white-collar crimes need not be "black stain on common sense."); s*ee also United States v.

Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), aff'd, 301 F. App'x 93 (2d Cir. 2008)

(criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the

amount of actual or intended financial loss").

       In addition, because Mr. Ho believed the funds he was asked to launder as part of the

sting operation derived from an offense involving firearms, the presentence report has assessed a

six-level enhancement under USSG § 2S1.1(b)(1)(B)(iii).  PSR ¶ 21.  Mr. Ho does not dispute

the application of that enhancement.  Nonetheless, it is important to consider its impact on his

guidelines range, whether it is the range he believes is appropriate (135 to 168 months at a Level

33), the range reflected in the PSR (188 to 235 months at a Level 36), or the range for which the

government is advocating (262 to 327 months at a Level 39).  To be sure, the government is free

to select whatever fact pattern it wants when designing a sting operation.  Here, investigators

chose two, one of which involved the sale of rifles to a customer in the Congo.  It is important to

consider, however, that prior to the sting operation, Mr. Ho had never laundered funds for

individuals engaged in this sort of activity.  As evidenced by the banks' frequent recalls of

incoming funds, Chief Onwa was involved in a scheme to defraud.  Mr. Ho does not dispute that

he willingly agreed to launder funds for agents posing as firearms dealers and is not suggesting

he was entrapped.  But it is important to consider that the particular fact pattern the government

chose to insert into the sting operation has the effect of nearly doubling his guidelines range.[5]  In

---

[5] This is the case whether there is an increase from Level 27 to 33, Level 30 to 36, or Level 33 to 39.

other words, if the government had elected to develop evidence of Mr. Ho's state of mind by means of a sting operation that employed the same type of conduct in which he had been involved up to that point, his guidelines range would have been roughly half of what it came out to be with the six-level enhancement. The Court should take this fact into consideration in fashioning a variant sentence.

Sentencing Guidelines Policy Statements

The guidelines policy statements refer to the need for just punishment. The introductory chapter, for example, outlines the basic purposes of criminal punishment that supported the guidelines' creation. Included among those purposes is just punishment. USSG, Ch. 1, Part A (Introduction and Authority). Mr. Ho respectfully submits that the totality of circumstances in this case suggest that a sentence well below the guidelines would be just punishment.

Avoidance of Unwarranted Sentencing Disparities

A variant sentence is consistent with the recent sentence of a defendant convicted of money laundering offenses in a related case involving victim M.G.

In *United States v. Kenietta Rayshawn Johnson*, Case No. 8:15-cr-320-SDM-TGW-6 (M.D. Fla. Oct. 20, 2017), the defendant took part in a conspiracy involving "a sophisticated fraud and money network that preyed on victims throughout the world." Ex. 8 at 1 (Order making findings of fact in *United States v. Priscilla Ann Ellis, Perry Don Cortese, and Kenietta Rayshawn Johnson et al.*). The offense involved proceeds misappropriated from M.G.'s account—presumably at the direction of Chief Onwa or an associate of his—at about the same time Mr. Ho received proceeds from the same account. The defendant's guidelines range was 168 to 210 months, which corresponds to an offense level of 35. Ex. 9 (Defendant Kenietta Rayshawn Johnson's Sentencing Memorandum at 1). The court sentenced the defendant, whom

the court described as "bright and young and promising," to a to a term of 40 months of imprisonment (along with restitution in the amount of $3.7 million).  Ex. 8 at 3; Ex. 10 (Judgment in *United States v. Kenietta Rayshawn Johnson*).

Need to Provide Restitution to Victims of the Offense

Mr. Ho recognizes he will owe restitution to the victims of the offense.  Given his high income potential, a sentence substantially below the guidelines will permit Mr. Ho more quickly to begin making victims whole.

After serving his sentence, Mr. Ho intends to continuing making positive contributions to society by starting a clean water and air technology company and returning to the field of intellectual property law as either a practicing attorney, if possible, or a non-legal consultant.

## CONCLUSION

Mr. Ho recognizes he broke the law.  He is remorseful and wants to make amends for what he did.  He has accepted responsibility for his conduct and has been working with the government by participating in multiple extensive proffer sessions.  He is a man of strong character who wants to return to raising his sons and continue to do the important work to which he has devoted most of his professional life.  For the reasons set forth above and those to be

presented at the sentencing hearing, Mr. Ho respectfully asks the Court to impose a sentence that is significantly below the guidelines.

Respectfully submitted,

By:     _____/s/_____

Timothy D. Belevetz
Holland & Knight LLP
1650 Tysons  Suite 1700
Tysons, VA  22102
Tel:  (703) 720-8088
Fax:  (703) 720-8610
timothy.belevetz@hklaw.com

*Counsel for Defendant Raymond Juiwen Ho*

## <u>CERTIFICATE OF SERVICE</u>

       I certify that on this 28th day of January 2018, I caused the foregoing to be filed electronically using the Court's CM/ECF system, which sends a notification of such filing to:


| | |
|---|---|
| Alexander P. Berrang | Ryan K. Dickey |
| Assistant U.S. Attorney | Senior Counsel |
| U.S. Attorney's Office | U.S. Department of Justice, Criminal Division |
| 2100 Jamieson Avenue | Computer Crime and Intellectual Property Section |
| Alexandria, VA  22314 | 1301 New York Avenue, N.W., Suite 600 |
| Tel:  (703) 299-3700 | Washington, DC  20530 |
| Fax:  (703) 299-3981 | Tel:  (703) 299-3753 |
| alexander.p.berrang@usdoj.gov | Fax:  (202) 514-6113 |
| | ryan.dickey@usdoj.gov |
| | |
| James S. Yoon | Kendrack D. Lewis |
| Trial Attorney | Trial Attorney |
| U.S. Department of Justice | U.S. Department of Justice, Criminal Division |
| Criminal Division | Money Laundering and Asset Recovery Section |
| Computer Crime and Intellectual | 1400 New York Avenue, N.W. |
|   Property Section | Washington, DC  20005 |
| 1301 New York Avenue, N.W., Suite 600 | Tel:  (202) 616-2345 |
| Washington, DC  20530 | kendrack.lewis@usdoj.gov |
| Tel:  (202) 514-1115 | |
| Fax:  (202) 514-6113 | |
| james.yoon@usdoj.gov | |

*Counsel for the United States*


                                   /s/
                               Timothy D. Belevetz
                               Holland & Knight LLP
                               1650 Tysons Boulevard, Suite 1700
                               Tysons Corner, VA  22102
                               Tel:  (703) 720-8600
                               Fax: (703) 720-8610
                               timothy.belevetz@hklaw.com